UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIMOY HODGE,
    Petitioner,

vs.                                                   Case No.:  4:21cv107/WS/EMT

MARK INCH,
    Respondent.
_____/

## **REPORT AND RECOMMENDATION**

This cause is before the court on a pro se habeas petition filed under 28 U.S.C. § 2254 by Petitioner Kimoy Hodge (Hodge) (ECF No. 1).  Respondent (the State) filed a motion to dismiss the petition as untimely (ECF No. 10), with relevant portions of the state court record (ECF Nos. 10-1 through 10-17).  Hodge responded in opposition to the motion to dismiss (ECF Nos. 16, 17).[1]

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.

---

[1] One of the arguments asserted in Hodge's responsive filings is that Respondent's typographical error in the case style of the motion to dismiss (i.e., indicating the wrong initials of the assigned judges) divests the court of jurisdiction to consider Respondent's motion.  This argument is legally frivolous and irrelevant to the substantive issues presented in this case.  Despite the typographical error, Respondent's motion to dismiss addressed the timeliness of Hodge's § 2254 petition (ECF No. 1) and his actual innocence/fundamental miscarriage of justice arguments asserted therein. Hodge's responsive arguments demonstrate that the typographical error did not confuse or otherwise inhibit him from responding to Respondent's timeliness argument.

*See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of the timeliness issue, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that the State's motion to dismiss should be granted, and the habeas petition dismissed as untimely.

I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF Nos. 10-1 through 10-17).[2]  Hodge was charged in the Circuit Court in and for Leon County, Florida, Case No. 2016-CF-1900, with one count of burglary of a dwelling with a person assaulted (Count 1) and one count of domestic battery by strangulation (Count 2) (ECF No. 10-1 (amended information)).  On April 27, 2017, Hodge entered a written plea agreement with the State, pursuant to which he agreed to enter no contest pleas to both charges in exchange for a total sentence of six years in prison followed by ten years of "mental

---

[2] The court refers to the document numbers and page numbers automatically assigned by the court's electronic filing system.

health" probation, with the sentence running concurrently with his sentences in Leon County Case No. 2016-CF-1980 (ECF No. 10-2 at 78–79 (written plea agreement)).[3] At a hearing on April 27, 2017, the trial court conducted a plea colloquy, accepted Hodge's plea as knowingly and voluntarily entered, and sentenced Hodge in accordance with the plea agreement, specifically, to a term of six years in prison followed by ten years of probation on Count 1 and a concurrent term of five years in prison on Count 2 (*see id.* at 149–69 (transcript of plea and sentencing hearing)). Judgment rendered the same day, April 27, 2017 (*see* ECF No. 10-9 at 4–16 (judgment)).   Hodge did not appeal the judgment.

On May 7, 2018, Hodge filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, asserting two grounds for relief (ECF No. 10-2 at 31–49 (Rule 3.850 motion)).   The circuit court summarily denied Ground One and set an evidentiary hearing on Ground Two (*id.* at 95–103 (order)).   The evidentiary hearing was held on February 25, 2019 (ECF No. 10-3 at 45–116 (transcript of evidentiary hearing)).   In an order rendered on February 27, 2019, the circuit court denied Hodge's Rule 3.850 motion

---

[3] Hodge's convictions in Case No. 2016-CF-1980 are the subject of his § 2254 petition filed in Case No. 4:21cv108/MW/MAF.

but ordered the clerk of court to correct the judgment to conform with the court's oral pronouncement of sentence (*id.* at 9–31) (order)).  Hodge appealed the denial of his Rule 3.850 motion to the Florida First District Court of Appeal (First DCA), Case No. 1D19-1180 (ECF No. 10-4 (Hodge's initial brief); ECF No. 10-5 (State's answer brief); ECF No. 10-6 (Hodge's reply brief)).  The First DCA affirmed the lower court's decision per curiam without written opinion on March 30, 2020 (ECF No. 10-7 at 3–4 (decision)).  *Hodge v. State*, 292 So. 3d 1154 (Fla. 1st DCA 2020) (Table).  The mandate issued April 27, 2020 (ECF No. 10-7 at 2 (mandate)).

On May 1, 2020, Hodge filed a motion for reduction or modification of sentence in the state circuit court, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (ECF No. 10-8 (Rule 3.800(c) motion)).  On May 13, 2020, the circuit court dismissed the motion as untimely and without merit (ECF No. 10-9 at 2–3 (order)).

On July 8, 2020, Hodge filed a motion for correction of illegal sentence in the state circuit court, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (ECF No. 10-11 (Rule 3.800(a) motion)).  The circuit court denied the motion on July 31, 2020 (ECF No. 10-12 at 2–3 (order)).

On September 15, 2020, Hodge filed a second Rule 3.850 motion in the state circuit court (ECF No. 10-13 (Rule 3.850 motion)).  On October 23, 2020, the circuit court denied the motion as successive and untimely (ECF No. 10-14 at 2–3 (order)).  The court denied Hodge's motion for rehearing on November 16, 2020 (ECF No. 10-15 (order)).

On January 15, 2021, Hodge filed a habeas petition in the First DCA, Case No. 1D21-216 (ECF No. 10-16 (petition)).  The First DCA denied the petition on the merits on March 25, 2021 (ECF No. 10-17 at 2–3 (decision)).  *Hodge v. State*, 313 So. 3d 1195 (Fla. 1st DCA 2021) (Mem).

Hodge commenced this federal habeas action on February 15, 2021, while his state habeas petition was still pending (*see* ECF No. 1 at 15).

## II.   DISCUSSION

A one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment.  *See* 28 U.S.C. § 2244(d)(1).  The limitation period runs from the latest of:

> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the

United States is removed, if the applicant was prevented from filing by
such State action;

    (C) the date on which the constitutional right asserted was
initially recognized by the Supreme Court, if the right has been newly
recognized by the Supreme Court and made retroactively applicable to
cases on collateral review; or

    (D) the date on which the factual predicate of the claim or claims
presented could have been discovered through the exercise of due
diligence.

28 U.S.C. § 2244(d)(1). The time during which a properly filed application for state
post-conviction or other collateral review is pending is not counted toward the one-
year federal limitations period. *See* 28 U.S.C. § 2244(d)(2).

    The State contends the appropriate statutory trigger for the federal limitations
period in this case is the finality date of the judgment, pursuant to § 2244(d)(1)(A)
(*see* ECF No. 10 at 8). As indicated *supra*, Hodge did not appeal his judgment and
sentence, which was entered April 27, 2017. If a prisoner does not appeal the state
court judgment, his conviction becomes final when the time for filing a direct appeal
expires. *See* Fla. R. App. P. 9.140(3). Hodge's conviction became final, for federal
habeas purposes, on Tuesday, May 30, 2017 (Monday, May 29, was a holiday), upon

expiration of the thirty-day period in which to file a direct appeal.[4]  The federal limitations period commenced the next day, on May 31, 2017.

The federal limitations period ran untolled for a period of **341 days** until May 7, 2018, the date Hodge filed his Rule 3.850 motion (*see* ECF No. 10-2 at 31 (Rule 3.850 motion)).  The federal clock stopped until April 27, 2020, when the First DCA issued the mandate in the post-conviction appeal.  The limitations period re-commenced on April 28, 2020, and expired **24 days** later, on Friday, May 22, 2020 (**341 days + 24 days = 365 days**).[5]  Hodge's § 2254 petition, filed on February 15, 2021, was untimely.[6]

---

[4] Federal Rule of Civil Procedure 6(a) provides that "[i]n computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event or default from which the designated period of time begins to run shall not be included."  Fed. R. Civ. P. 6(a); *see also Washington v. United States,* 243 F.3d 1299, 1301 (11th Cir. 2001) (Rule 6 applies to calculation of one-year statute of limitations under AEDPA).

[5] Hodge's Rule 3.800(c) motion did not toll the limitations period.  One of the state court's grounds for dismissal of the Rule 3.800(c) motion was its untimeliness, which means that it was not "properly filed" for purposes of § 2244(d)(2).  *See Allen v. Siebert*, 552 U.S. 3, 7 (2007) (state time limits, no matter their form, are filing conditions, thus state post-conviction relief petition is not "properly filed," within meaning of tolling provision of AEDPA's imitations period for federal habeas petitions, if it was rejected by state court as untimely); *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005).

[6] To the extent Hodge may argue that his one-year AEDPA clock completely restarted pursuant to the state trial court's order of February 27, 2019, directing correction of the judgment to reflect the sentencing court's oral pronouncement of sentence, such argument should be rejected for the same reasons the district court rejected this argument in Hodge's other habeas case.  *See Hodge v. Florida*, No. 4:21cv108/MW/MAF, 2021 WL 4896585, at *3 (N.D. Fla. Sept. 28, 2021), *adopted*, 2021 WL 4894697 (N.D. Fla. Oct. 20, 2021).  The original judgment authorized Hodge's confinement, and the February 27, 2019 order did not give the FDOC any new authority to

Hodge contends he has overcome the time bar with newly discovered evidence of his actual innocence of the burglary and battery charges, which entitles him to review of his claims through the "fundamental miscarriage of justice" exception (*see* ECF No. 16 1–11).

The Supreme Court has consistently reaffirmed the existence and importance of a "fundamental miscarriage of justice" exception to procedural and time bars. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995) (citations omitted). The Court recognized that a "credible showing of actual innocence" provides a "gateway" through which a petitioner may pursue his federal habeas claims on the merits notwithstanding his failure to file his habeas petition within the statute's otherwise applicable limitations

---

imprison Hodge; rather, the order merely directed the clerk to conform the written judgment to the court's oral pronouncement of sentence (*see* ECF No. 10-3 at 26–27 (transcript of plea and sentencing hearing); ECF No. 10-9 at 4–16 (original (uncorrected) judgment)). *See Patterson v. Sec'y, Fla. Dep't of Corr.*, 849 F.3d 1321, 1326–27 (11th Cir. 2017) (en banc) (holding that an order granting habeas petitioner's motion to correct his sentence did not qualify as a new judgment because the state court "never issued a new prison sentence . . . to replace" his original sentence or "issue[d] a new judgment authorizing [his] confinement"); *see also, e.g.*, *Davis v. Sec'y, Dep't of Corr.*, No. 21-10171-A, 2021 WL 1567343, at *2 (11th Cir. Apr. 21, 2021) (holding that state court's order amending petitioner's sentence to reflect that petitioner would serve a five-year term of probation did not restart AEDPA limitations period because the order did not impose a new sentence or authorize the FDOC to take any action as to petitioner's sentence; rather, state court's order merely clarified that petitioner would serve a five-year term of probation, consistent with court's oral pronouncement of sentence, which controlled over the written sentencing document); *Vaughan v. Sec'y, Fla. Dep't of Corr.*, 770 F. App'x 554, 556 (11th Cir. 2019) (holding that state court's order amending petitioner's original judgment did not constitute a new judgment that reset the AEDPA's one-year statute of limitations because petitioner remained in custody pursuant to the original judgment and his term of imprisonment was not altered by the amendment).

Case No.: 4:21cv107/WS/EMT

period. *McQuiggin v. Perkins*, 566 U.S. 386 (2013). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623–24 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). To pass through this gateway, however, a petitioner must satisfy the standard for actual innocence articulated by the Supreme Court in *Schlup*. Under *Schlup*, a petitioner must show that, in light of newly presented evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," *id.* at 327, or, to remove the double negative, "that more likely than not any reasonable juror would have reasonable doubt," *House v. Bell,* 547 U.S. 518, 538 (2006).

*Schlup* makes clear that, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." 513 U.S. at 324. This new evidence must do more than counterbalance the evidence that sustained the petitioner's conviction. *See Sibley v. Culliver*, 377 F.3d 1196, 1207 (11th Cir. 2004) (concluding that even if new evidence showed that the murder victim was the aggressor, "a reasonable juror could still quite possibly have concluded that [petitioner] acted with murderous intent, rather than out of self-defense"). The new

evidence must be so significant and reliable that, considered with the trial record as a whole, it "undermine[s] confidence in the result of the trial." *Schlup*, 513 U.S. at 327 (internal quotation marks omitted).

The factual basis for Hodge's plea to the burglary and battery charges is described in the probable cause affidavit, which reads:

> On 06/09/2016, at approximately 8:25 am., Officer Chris Pate 781 was dispatched to 1600 Old Bainbridge Road in reference to a burglary with a person battered. Upon arrival, Officer Pate met with the victim Jasmine Fowler. The victim stated early that morning her ex-boyfriend, Kimoy Hodge, entered her residence through an unlocked rear window. This window allowed direct access to her bedroom. According to the victim, she ended the relationship on 06/05/2016. The victim said when she woke up and realized Hodge was in the room, she began to scream and told Hodges [sic] to leave multiple times. Hodge proceeded to "pin" the victim against her bed, while blame [sic] the victim for their relationship ending. After pinning the victim, Hodge released her, got up off the bed, and began going through her cellular phone. Upon searching the phone, Hodge discovered the victim was seeing someone else and that fact caused Hodge to go into a rage. Hodge proceeded to push the victim against her closet and began to choke her around the throat. After a period of time, Hodge finally released the victim and continued to blame her for their problems. According to the victim, Hodge eventually state [sic] he was going to kill himself in front of her apartment and fled the area around 7:45 a.m.
>
> While on scene, officers observed the victim had a small scratch on the right side of her throat and small cut on her bottom lip. The victim advised she had no other injuries and refused any medical help. See images of injuries below:

[one photograph of victim's lip and two photographs of victim's neck]

While on scene, Officer Pate attempted to located latent prints at the point of entry, but the window was not conducive to process due to a large amount of dirt/grime on it. Nothing else of evidentiary value was located on scene. While the investigating officer was on scene, the victim completed a sworn written statement concerning this incident. At the time the victim completed the statement, she indicated she wished to pursue criminal charges against Hodge. After the scene had been cleared, the victim called Officer Pate and stated she did not want to pursue criminal charges. The victim also stated she had not has [sic] spoken to Hodge since the incident. The victim further stated she "felt it wasn't right to put him (Hodge) in prison. Officer Pate and the victim further discussed her wishes and it was decided she would speak to an investigator prior to making any final decisions.

After being assigned this case, this investigator met with the victim on 6/15/16. The victim voluntarily responded to the Tallahassee Police Department and provided an updated verbal and sworn written statement. The victim verbally confirmed the facts of the physical contact initiated by the suspect. In her written statement the victim stated Hodge didn't batter her "on purpose" and had been allowed to enter the residence through the window in the past. In the past, Hodge would knock on the window and the victim would let him in. At the time of this incident the victim was sleeping, so it is unknown if Hodge knocked. It is known the victim did not grant Hodge entry at the time of this incident. The victim further stated at the time of the incident, she and Hodge were separated, but still technically together. The victim further stated Hodge was not living at the victim's apartment and was not keeping property there. The victim stated, both verbally and in writing she does not wish to pursue charges against Hodge.

The victim wrote she believes jail would not help Hodge, that he needs counseling or some type of rehab, and Hodge "does thing at an impulse." The victim also confirmed Hodge threatened to kill himself

during the incident, but she did not believe he had a planned method or means to kill himself at the time of the incident. The victim further stated no one, including Hodge, did anything to influence her wishes about pursing charges in this case. When this investigator attempted to determine if the victim and Hodge's relationship was domestic in nature, the victim stated she and Hodge had resided together as a couple. The victim further stated to this investigator, Hodge had not paid bills at the apartment and did not receive mail there. The victim did write in her statement that Hodge resided with her from January 2016 until May 2016 and during that time he kept his clothing at her apartment.

. . . .

Due to the information provided by the victim, this investigator has reason to believe the victim and Hodge's relationship was domestic in nature und Hodge did unlawfully enter or remain in a structure located at 1600 Old Bainbridge Road Apartment 112B, the dwelling of Jasmine Fowler, with intent to commit the offense of a battery or some offense therein, and in the course of committing the offense did make an assault or a battery upon a person, Jasmine Fowler, contrary to Section 810.02(2)(a), Florida Statutes. Hodges [sic] did also knowingly and intentionally, against the will of another, impedes [sic] the normal breathing or circulation of the blood of Jasmine Fowler, a family or household member or of a person with whom he or she is in a dating relationship, so as to create a risk of or cause great bodily harm by applying pressure on the throat or neck of the other person or by blocking the nose or mouth of the other person, contrary to Section 784.041(2)(A) Florida Statutes.

(ECF No. 10-2 at 101–03 (probable cause affidavit)).

Jasmine Fowler provided the following sworn written statement to law enforcement on the night of the incident, June 9, 2016:

Around 5:45 a.m., my ex Kimoy Hodge broke into my apt. window. I woke up and screamed. I asked him to leave repeatedly both screaming

and calm.  I tried to run out my room door.  I was grabbed and pushed away from it.  That happened several times.  He pinned me on bed and wanted me to "listen" to him yet he was screaming about all the "hurt" I've caused in the past.  I continued to tell him leave, get out etc.  My dog was barking.  He threw my dog in the cage.  He then proceeded to go through my phone and found out I was with someone else and basically choked me against my closet until I tried to scream and kick free.  After that he told me to stop crying and yelling.  He put his hand over my mouth and began to read his blog to me about how he feels and how I hurt him.  I just <u>complied</u> and said sorry for everything so he can leave.  He told me repeatedly that I caused all this.  It's all my fault.  He also mentioned that he was going to kill himself in front of my home.  He called someone on my phone.  I believe it was one of his friends.  I heard in the background he was saying where is that after he said Aqua Palms [the name of Ms. Fowler's apartment complex].  He soon left and told me the whole city will know what I've done to him and he'll get his payback.  I locked the door as soon as he left and checked on my dog then put on clothes so I can be ready for class if I make it.

(ECF No. 10-2 at 188–89 (sworn statement of Jasmine Fowler, dated June 9, 2016))

(verbatim, including emphasis).

Six days later, on June 15, 2016, Ms. Fowler provided a second sworn statement to law enforcement:

I have thought about the actions that have taken place and I do believe Kimoy didn't do it on purpose.  In the past Kimoy has knocked on my window & I have let him in.  This one particular night/morning we were separated but still technically together.  He scared me by coming through the window.  Out of being woken up and alarmed I yelled, he grabbed me and I was scared.  He just wanted to talk to me and have me finally listen.  I was shooken up how it happened.  I was freaking out and he grabbed my phone but when he went through it, he saw that I was w/someone else once again.  I've unfortunately cheated on him

several times which is why he has trust issues w/me.  When he read that I was with someone else it was if he snapped and turned into a completely different person.  He was screaming and crying at me.  When he read me his journals he just kept repeating he needed me to "listen to him."

After he read me his blogs about how I made him feel he told me he wanted to kill himself because of all that I've done as well as everything else he's going through.  I think he's in need of some type of counseling.  I don't think he was driven by himself when he came to my home.  He does things at an impulse sometimes, like he doesn't think things completely through.  I believe that counseling or some type of rehab center will help, not jail.  Honestly he may kill himself in jail.  His business partner called after he came to her home with cuts on his arm that she said look like letters.  I don't think he is stable mentally & emotionally.  He has tried seeking help in the past but doesn't have the funds to do so or family support.  Also Kimoy <u>has stayed w/me</u> from around Jan–May.  It has been off and on since we've been together but most nights always w/me.  <u>His clothes were at my home</u> most of the time but they would switch occasionally, but from Jan–May <u>they were at my home</u>.  I worry about Kimoy.  Also, his family has been calling me and texting me since the incident asking me where he is.  He's disappeared for about a week now+.  It's really not like him.  He would leave to take walks in the park for like an hour but not just hear from in a week.  I think he's finally lost it/snapped.

(ECF No. 10-2 at 190–93 (statement of Jasmine Fowler, dated June 15, 2016)) (verbatim, including emphasis).

Hodge filed his Rule 3.850 motion on May 7, 2018, and attached the following sworn statement from Ms. Fowler dated March 12, 2018:

I wanted to come forward and speak on said incident of case # 2016CF1900A.  While trying to come forward and discuss what

happened that night, I wasn't exactly clear and wanted to clarify everything to the best of my ability. I felt intimidated at the time and nervous about my words being twisted. As I stated before, me and Mr. Hodge has an outstanding (still going) agreement of him entering our home (our due to most if not all his clothing being there, receiving mail there etc) through the unlocked window. I had just come from a night out and was a bit drunk so when someone came in I was startled. Mr. Hodge tried to calm me down and state who he was by making me realize it was him. After I realized who it was, I had no issue with him trying to make me calm down, he wasn't trying to harm me. We got into an argument, but I wasn't harmed. I became aggressive towards him which I didn't state and to keep me out of his space he extended his arm (which at my height is my neck) he never squeezed his hands or stopped me from breathing. I used the wrong words to describe this and wanted to clear that up. I would have never been touched if I didn't continue, to come at him. Officers took pictures of scratches, but I never indicated where they came from or even told them that he gave them to me because they didn't. Again, I had no issue with how he tried to calm me down and keep me from overreacting, I was upset and could have described the incident better.

(ECF No. 10-2 at 187 (statement of Jasmine Fowler, dated March 12, 2018)) (verbatim).

Hodge proceeded pro se at the post-conviction evidentiary hearing. He called Ms. Fowler as a witness and examined her as follows, in relevant part:

Q [by Hodge]. My first question to you is, could you please for the Court give a brief description of our living situation as in daily activities, certain things that were going as far as our living situation.

A. We lived together. He did have the keys to my house. When I would be at school he would take out the dog or do groceries or other

like house things like that.  Laundry, so, in other words, he had things there whether it was his clothing, his work, stuff like that.

Q.  During the time of this case, is it true that we were, in your words, from what you wrote in the past, technically separated?

A.  Yes, we were separated.  But we were still together, still almost every day.

Q.  And did any of those things you stated as far as our living arrangement really change due to us being technically separated?

A.  No.

Q.  Okay.  I guess we'll go to the incident itself.  You stated that you were basically choked.  Could you for the record, I guess, describe that in a better way.  I guess, like what would your definition of basically be?

A.  I would say being that we both were intoxicated, things did get a little heated, but I don't think that would have been the best term for me to use.  I would say that he did try to calm me down, but he didn't exactly put his hands on me.

Q.  So would you say that you complied with me to calm you down?

A.  Yes.  I didn't try like fight you off or anything.  Like you—I know you.  Like we're—we're simply together, not really, but I was comfortable enough for you to calm me down.

Q.  And um, it was stated that we got into an argument after me allegedly coming through the window to our home.  How did the argument come to be?

A.  I don't exactly remember what the argument was about, but I do know at the time when you came through the window, allegedly, that wasn't necessarily the issue once I realized who it was coming to the window.  The issue happened after we talked about it and there was—that was the issue.  I don't remember exactly what it was, though.

Q.  So, you're saying, after being calmed down, you—I don't want to put words in your mouth, but you're saying basically after you had calmed down, you allowed me to stay to talk?

A.  Yes.  We stayed to talk and the argument happened during our talking about something else.

Q.  All right, was this ever brought out to the officers you spoke to that day?

A.  I don't believe so.

Q.  Were you ever questioned about that?

A.  No.

(ECF No. 10-3 at 53–55).

On cross-examination by the State, Ms. Fowler testified:

I just don't feel that he deserved that much of a sentence for something that was, I guess small, that blew up into things that were way bigger.

So I felt on my behalf, like to try to help him reduce the sentence, that this the least I could do to clarify the things that happened.

Q.  Okay.  So you wrote that after he was already sentenced on these cases?

A.  2018?

Q.  Correct.

A.  Yes.

Q.  And you knew what the sentence was and thought it should be lower?

A.  Yes.

Q.  And so you wrote that in order to try to help him reduce his sentence?

A.  Um, and clarify just everything that happened in general.

Q.  Okay.  That had happened back in 2016?

A. Yes.

(ECF No. 10-3 at 64–65).

Ms. Fowler's post-conviction statement and testimony appear to explain or "clarify" (to use her words) what she meant by the terms "technically separated" and "choked" in her pre-trial statements to police in June of 2016.  That Ms. Fowler changed her story in some respects as time passed does not establish that the later story was true or that her first story was false, especially considering the nature of her relationship with Hodge and the fact that she was the victim of the domestic battery and burglary charges.  *See Kuenzel v. Comm'r, Ala. Dep't of Corr.*, 690 F.3d

1311, 1317 (11th Cir. 2012) (noting that the fact that a witness changed his or her story does not establish which story was true or which story was false and would not prevent a reasonable juror from believing one story or the other). Further, even if a jury heard Ms. Fowler's "clarifying" statements, reasonable jurors still could have concluded that the evidence established Hodge's guilt of both offenses beyond a reasonable doubt.

> Florida law defines burglary as:
>
> 1. Entering a dwelling . . . with the intent to commit an offense therein, unless . . . the defendant is licensed or invited to enter; or
>
> 2. Notwithstanding a licensed or invited entry, remaining in a dwelling . . . :
> a. Surreptitiously, with the intent to commit an offense therein;
>
> b. After permission to remain therein has been withdrawn, with the intent to commit an offense therein; or
>
> c. To commit or attempt to commit a forcible felony, as defined in s. 776.08.

Fla. Stat. § 810.02(1)(b). "Forcible felony" is defined as any felony which involves the use or threat of physical force or violence against any individual. *See* Fla. Stat. § 776.08. An affirmative defense to burglary is that the defendant lived at the dwelling or had permission to enter. *See McGhee v. State*, 307 So. 3d 815, 819 (Fla. 5th DCA 2020).

Had there been a trial on Hodge's charges, and if Ms. Fowler's trial testimony matched her post-conviction statements, the prosecutor would have been able to present the jury with Fowler's prior statements that were inconsistent with her trial testimony.  So if Ms. Fowler testified that Hodge was living at her apartment or had permission to enter through her bedroom window on the night of June 9, 2016, the prosecutor could have called Investigator John Ruchle to testify that on June 15, 2016, Ms. Fowler told him that Hodge was *not* living at the apartment at the time of the incident, and that she did *not* grant Hodge entry at the time of the incident (*see* Probable Cause Affidavit, ECF No. 10-2 at 102).

With respect to intent, a reasonable juror could conclude there was sufficient evidence that Hodge entered Ms. Fowler's apartment with intent to commit an offense therein, specifically assault.  Florida law defines "assault" as "an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent."  Fla. Stat. § 784.011(1).  Ms. Fowler stated that when Hodge came in through the window, she repeatedly asked him to leave and tried to run for the door.  She stated that each time she tried to run, Hodge grabbed her and pushed away from the door.  She stated Hodge then pinned

her on the bed, screaming about how she had hurt him in the past and forcing her to "listen" to him by covering her mouth.   A reasonable juror could conclude that Hodge assaulted Ms. Fowler and intended to do so when he entered the window of her apartment.

The same is true of the domestic battery by strangulation charge, which is defined as follows:

> A person commits domestic battery by strangulation if the person knowingly and intentionally, against the will of another, impedes the normal breathing or circulation of the blood of a family or household member or of a person with whom he or she is in a dating relationship, so as to create a risk of or cause great bodily harm by applying pressure on the throat or neck of the other person or by blocking the nose or mouth of the other person.

Fla. Stat. § 784.041(2)(a).

If Ms. Fowler testified at a trial, as she did in her post-conviction statement and testimony, that Hodge "extended his arm (which at my height is my neck) he never squeezed his hands or stopped me from breathing" and that Hodge "did try to calm me down, but he didn't exactly put his hands on me," the prosecutor would have been able to present the jury with Ms. Fowler's prior inconsistent statements that Hodge "choked me against my closet until I tried to scream and kick free.  After that he told me to stop crying and yelling.  He put his hand over my mouth . . . ."

While the "new evidence" offered by Hodge might have supported an affirmative defense or created some doubt about his guilt of one or both charges, it is not "of the powerful kind that would individually or collectively show that it is *more likely than not that no reasonable juror* would have convicted him in the light of the new evidence." *Kuenzel*, 690 F.3d at 1318 (emphasis in original) (quoting *Schlup*, 513 U.S. at 327). Hodge has not met the *Schlup* standard and thus may not gain federal review of his time-barred petition through the fundamental miscarriage of justice exception.

III.   CONCLUSION

Hodge's federal habeas petition was not filed within the one-year statutory limitations period; and he has not shown he is entitled to federal review of his habeas claims through the "actual innocence" gateway recognized in *McQuiggin*. Therefore, the State's motion to dismiss should be granted, and the habeas petition dismissed with prejudice as untimely.

IV.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate

is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, — U.S.—, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327). The petitioner here cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that

party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Respondent's motion to dismiss (ECF No. 10) be **GRANTED**.

2.      That the petition for writ of habeas corpus (ECF No. 1) be **DISMISSED with prejudice** as untimely.

3.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 23rd day of November 2021.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**